IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD BARTLEY, | : | Civil Action No. 4:11-CV-1458 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| SHARON TAYLOR, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

June 11, 2014

## I. BACKGROUND:

As life imitates art[1], so too may life imitate sport.   Here, the parties are wrestling over competing interests in the *First Amendment* to the United States Constitution; namely, Plaintiff's right to free speech against Defendant's right to petition the government for redress of grievances *(inter alia)*.   For the reasons that follow, the Court holds that there is no adverse impact on Plaintiff's right to free speech.   Accordingly, Defendant's motion for summary judgment will be granted and this case will be dismissed.

On August 8, 2011, Plaintiff, Todd Bartley (hereinafter "Bartley"), kicked-

---

[1]The full quote reads, "Life imitates art, more than art imitates life." Oscar Wilde.

off (to use the sports lexicon, which the court will employ in this opinion as sports lexicon is part of both Bartley's and Taylor's wheelhouse) the instant action by filing a complaint against Defendant, Sharon Taylor (hereinafter "Taylor"), in the United States District Court for the Middle District of Pennsylvania.  ECF No. 1.

Bartley is a sports reporter for, and the general manager of, ESPN 1050, a radio station in Williamsport, Pennsylvania. Bartley has reported on the performance of Taylor, the (at the time of the events in question) Athletic Director for Lock Haven University (hereinafter "LHU"), in Lock Haven, Pennsylvania.  In the complaint, Bartley alleges that Taylor engaged in a course of conduct to retaliate against Bartley for his critical reporting of Taylor's job performance. Specifically, Bartley alleges that Taylor retaliated against him by

> refusing Plaintiff opportunities to broadcast Lock Haven University sports, the filing of a frivolous lawsuit against Plaintiff, contacting individuals at ESPN headquarters in Bristol, Connecticut, in an effort to silence Plaintiff and harm his career; directing her staff not to communicate with Plaintiff; attempting to circumvent Pennsylvania's Right to Know Act by directing her staff to communicate via handwritten or type-written notes rather than emails; attempting to charge broadcast fees for NCAA events when she had no authority to do so; denying Plaintiff a meaningful opportunity to respond to a request for proposal to broadcast Lock Haven University sporting events in violation of state rules and regulations; not selecting ESPN 1050 Williamsport to broadcast Lock Haven University sports despite the fact that it offered the best and highest value; and preventing Plaintiff from establishing an internship program at Lock Haven University.

ECF No. 1 at 2-3.

The complaint alleges four counts, Count I, *First Amendment* retaliation in violation of 42 U.S.C. § 1983; Count II, Wrongful Use of Civil Proceedings; Count III, Injurious Falsehood-Disparagement; Count IV, Defamation.  Before discovery was conducted, Defendant filed a partial motion for summary judgment which was decided by (former Chief) Judge Yvette Kane, to whom this matter was previously assigned.  Judge Kane dismissed the three state law claims because these counts were barred by the doctrine of sovereign immunity.  Judge Kane did not dismiss Count I, stating that genuine issues of material fact preclude the Court from determining if the first count should be dismissed.[2]

The parties then engaged in discovery, during which time the case was reassigned to the undersigned.  On August 20, 2013, Defendant filed a motion for summary judgment which has been fully briefed and is now ripe for disposition.  ECF No. 36.

Today this Court holds that as a matter of law that there was no adverse impact on Plaintiff's *First Amendment* right to speech, and accordingly,

---

[2]Plaintiff argues that the allegations in this count must be held over for trial because of Judge Kane's prior decision.  The undersigned respectfully disagrees.  Judge Kane denied the prior motion for summary judgment without prejudice stating that genuine issues of material fact exist.  ECF No. 20 at 8. Now that discovery has been completed and the undisputed facts have been set forth by the parties, this matter is now ripe for disposition and dismissal.

defendant's motion for summary judgment will be granted and final judgment entered in favor of defendant and against plaintiff.[3]

## II. DISCUSSION:

### A. Undisputed Facts

Viewing the facts in the light most favorable to the non-moving party, Bartley, the facts, in chronological summary, are as follows.

Bartley is the general manager and lead investigative sports reporter for ESPN 1050, a radio station in Williamsport, Pennsylvania.  ESPN 1050 is owned by the Colonial Radio Group of Williamsport.  Bartley operates, but does not own, ESPN 1050.  ESPN 1050 has an affiliation agreement with ESPN headquartered in Bristol, Connecticut.  ESPN 1050 pays ESPN for the affiliation.   The agreement between ESPN and ESPN 1050 "spells out what programming ESPN will provide ESPN Williamsport and what ESPN Williamsport's obligation is to clear that programming.  That's as far as the agreement goes."  ECF No. 37 at 2 ¶ 5.

Taylor served as the Athletic Director of Lock Haven University in Lock Haven, Pennsylvania, between the years 1988 and 2012.

---

[3]As will be discussed *infra,* this determination is one the Court may make as a matter of law.  *See The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) ("Because our analysis of the adverse impact is objective, it can be resolved as a matter of law").

On May 12, 2009, Bartley emailed Troy M. Miller, who, according to Bartley's statement of facts, was employed by the LHU Foundation as director of Athletics Development.  ECF No. 48 at 2, ¶ 10.  Bartley emailed Miller to offer to carry the feed of a broadcast of softball regional championships.  Miller referred Bartley to Taylor.  Taylor responded to Bartley's email with an email that stated "the position we have taken in athletics is that there should be a fee for our product."  Bartley then emailed someone at the National Collegiate Athletics Association ("NCAA") who responded that the rights to the sporting event are the sole property of the NCAA and LHU may not charge a broadcasting fee.

In June 2009, another LHU employee called Taylor to advise her that a broadcaster on a sports program titled The Locker Room was "bashing" LHU athletics.  ECF No. 37 at 7, ¶ 29.  Taylor listened to a "link to the program" (the court presumes that this refers to an audio recording of a previously aired program).  ECF No. 37 at 7, ¶ 30.  This was the first time Taylor had heard Bartley's broadcast.  There was no guest on the program; only Bartley spoke.  Taylor believed the statements Bartley made were both negative and incorrect.  During the show, Bartley discussed an organization called Preserve the Legacy of Wrestling (hereinafter "PLOW"), which has also been critical of LHU athletics and Taylor.

Shortly after Taylor listened to the aforementioned broadcast, Bartley submitted a 'right to know' request for Taylor's emails.  Spurred by the right to know request, Taylor emailed her staff.  In that email, she stated that Bartley "has been working closely with the PLOW group that has set out to have [] me removed from the athletics department."  She further wrote, "Therefore if there is anything that you need to send to me or give to me that you do not want to have edited and used in some negative or twisted way on the local ESPN radio or web, DO NOT SENT IT TO ME ON THE COMPUTER OR VIA EMAIL."  ECF No. 37 at 8, ¶¶ 34 and 36 (emphasis in original).  Bartley ultimately was supplied with this email.

On June 9, 2009, Taylor, along with another LHU employee, listened to another broadcast by Bartley.  Bartley reviewed the aforementioned email written by Taylor.  According to an admitted statement of fact,

> Bartley backs the statements which Taylor stated were in PLOW's power point presentation, including that there was a problem with accountability, that Lock Haven had the second highest paid athletic department staff which was not producing results, that athletic program deficiencies needed to be corrected, that fund-raising drops could be directly attributed to the lack of leadership, and that people were increasingly disappointed in the athletic records.

ECF No. 37 at 9, ¶ 40.  In that same broadcast, Bartley stated,

> This lady of 22 years has systematically in her position, and again, if her name was Max Taylor, this guy has chased off anybody that even whispers a decenting [sic] opinion to make LHU athletics better.  You know, I remember somebody my grandparents told me about that you

> watch on the History channel that used to do that and they called it the Allies and the allies had to go in and push this gentleman back. That's the kind of mentality you're dealing with right now. Someone needs to go in and push this lady back and say enough is enough. We've had enough.

ECF No. 37 at 10 ¶ 41. In several of Bartley's shows he suggested that Taylor should be fired. On June 15, 2009, Bartley sent an email to the Lock Haven Council of Trustees that included critical remarks about Taylor.

On June 20, 2009, Taylor saw Carol Stiff, a senior director for programming and acquisitions from ESPN headquarters in Bristol Connecticut, at a dinner event. Taylor discussed ESPN Williamsport with Stiff. Taylor then emailed Stiff on June 23 and 27, 2009 with complaints about Bartley. Stiff called Taylor and advised Taylor that Bartley was not related to ESPN.

Taylor's complaints to Stiff about Bartley had no effect on Bartley. Stiff never contacted Bartley. In fact, "[n]o one has ever called Bartley and told him that his agreement with ESPN was in jeopardy." ECF No. 37 at 11, ¶ 48.

Additionally, on July 12, 2009, PLOW published a pamphlet about LHU which included statements about Taylor that she believed to be false.

In the summer of 2009, William Hanelly, the Vice President for Finance and Administration, along with Becky Proctor, the Director of Procurement, worked together to develop a business plan for radio coverage. At some point in 2009,

Bartley solicited LHU to offer ESPN 1050's services to broadcast LHU's sporting events. Hanelly, with Taylor's input decided not to accept Bartley's offer.  On July 30, 2009 Hanelly sent a letter to Bartley to inform him that LHU "decided not to move forward at that point," adding "[w]e may review broadcasting alternatives in the future and solicit proposals at that time.  We will certainly be in touch with you in that case."  ECF No. 37 at 6, ¶ 25.  Hanelly testified that the unfavorable opinions broadcast on ESPN 1050 were not a consideration Hanelly took into account in rejecting Bartley's offer.

On October 28, 2009, PLOW published another publication with statements about Taylor that she, again, believed to be false.  Taylor believed, mistakenly, that Bartley was a member of PLOW because she had seen emails addressed to PLOW members that also included Bartley's name as one of the email addressees. As it turned out, Bartley's name was on the email distribution list because in April 2009 he had requested that his name be added to the email distribution list.  The PLOW member who added Bartley to the PLOW distribution list wrote "Todd Bartley of Williamsport's ESPN Radio wants to be included in PLOW loop.  He is working to get the Taylor agenda exposed."  ECF No. 38-4 at 4.

In November 2009, ESPN 1050 published an article, written by Bartley, on it's website titled "Taylor and LHU Lose Another Court Battle."  The headline was

misleading, as Taylor was never a party to the litigation referred to in the article.

In December 2009, Taylor filed a lawsuit in the Court of Common Pleas of Clinton County, Pennsylvania.  The lawsuit was against PLOW, Bartley, and other individuals, based in relevant part, on the publications by PLOW and the aforementioned "Taylor and LHU Lose Another Court Battle" article.  The counts alleged against Bartley were libel per se, intentional infliction of emotional distress and conspiracy.  Taylor voluntarily dismissed all counts against Bartley except for libel per se for publication of the  "Taylor and LHU Lose Another Court Battle" article and the conspiracy count.  The Clinton County Court of Common Pleas subsequently dismissed both of these counts on summary judgment.

On June 11, 2011, LHU received a proposal from Bartley to broadcast athletic events.  Other stations also made proposals.  Accordingly to Bartley, Taylor was involved in the discussions that awarded the broadcast contract to another radio station.

In addition to this chronology, Bartley requested interviews from Taylor several times.[4]  Taylor never accepted the offer to be interviewed by Bartley. However, Bartley conceded that it is not uncommon for people to decline an

---

[4]This fact is disputed, thus is viewed in the light most favorable to the non-moving party, Bartley.  ECF No. 37 at 13 ¶ 50 and ECF No. 48 at 7 ¶ 50.

interview; he has had people refuse to comment throughout his broadcast career.

**B. Standard of Review:**

       *1. Summary Judgment*

     Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

     In  opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather its response must … set

out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The

non-moving party "cannot rely on unsupported allegations, but must go beyond

pleadings and provide some evidence that would show that there exists a genuine

issue for trial." *Jones v. United Parcel Service*, 214 F.3d 402, 407 (3d Cir. 2000).

Arguments made in briefs "are not evidence and cannot by themselves create a

factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent.

Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences therefrom must be viewed in the

light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442

F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement

about the facts or the proper inferences that a factfinder could draw from them.

*Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the

mere existence of some alleged factual dispute between the parties will not defeat

an otherwise properly supported  motion for summary judgment; there must be a

genuine issue of material fact to preclude summary judgment." *Anderson*, 477 U.S.

at 247-48.

2.  *42 U.S.C. § 1983:*

In order for plaintiffs to prevail under § 1983 they must establish two

elements: first, that the conduct complained of was committed by a person acting under color of state law; and second, that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993). Defendant does not dispute that the conduct complained of was committed by a person acting under color of state law. Defendant disputes the second element that establishes a claim under §1983; she argues that plaintiff was not deprived of the rights, privileges or immunities secured by the Constitution or laws of the United States.

## C. Analysis:

The *First Amendment* to the United States Constitution protects citizens right to speech.[5] Accordingly, the government may not retaliate when our citizens exercise their Constitutionally protected rights.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th

---

[5]It is important to note, however, for the lay reader of this opinion, that this right is not absolute. "[T]he Supreme Court never has accepted the view that the *First Amendment* prohibits all government regulation of expression." ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES THIRD EDITION (Aspen Publishers 2006), *and see Konigsberg v. State Bar of California*, 366 U.S. 36; 81 S. Ct. 997; 6 L. Ed. 2d 105 (1960).

Cir. 2000), *See ACLU v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."); *see also Pickering v. Board of Educ.*, 391 U.S. 563, 574, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech").  "Because government retaliation tends to chill an individual's exercise of his First Amendment rights, public officials may not, as a general rule, respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority." *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 415-416 (4th Cir. 2006), *citing Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *see also Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) ("If the government could deny a benefit to a person because of  his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited").  "Thus, by engaging in retaliatory acts, public officials place informal restraints on speech "allowing the government to 'produce a result which [it] could not command directly.'" *Suarez Corp. Indus.,* 202 F.3d at 685.  "Such  interference with constitutional rights is

impermissible."" *Id. citing Perry v. Sindermann*, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972) (alterations in original) (citation omitted).

Retaliation claims began in the public employment context to protect employees from being punished by their government employer for their speech. *See Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008), cert. denied, 128 S. Ct. 2445 (2008), *and see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,* 391 U.S. 563; 88 S. Ct. 1731; 20 L. Ed. 2d 811 (1968) (the seminal case on public employee *First Amendment* speech rights), *and see Garcetti v. Ceballos*, 547 U.S. 410; 126 S. Ct. 1951; 164 L. Ed. 2d 689 (2006). *Jenkins* was the first case to expand *First Amendment* retaliation claims from the public employment context to a viable cause of action for private citizens.

"A retaliation claim under 42 U.S.C. § 1983 must establish that the government responded to the plaintiff's constitutionally protected activity with conduct or speech that would chill or adversely affect his protected activity." *Balt. Sun Co.*, 437 F.3d at 416, *citing Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005);  *ACLU v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993).  "The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one -- we determine whether a similarly situated person of "ordinary firmness"

14

reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Balt. Sun Co.*, 437 F.3d at 416, *citing  Constantine*, 411 F.3d at 500; *Wicomico County*, 999 F.2d at 786; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (tailoring adverse impact analysis to specific circumstances presented). "Because our analysis of the adverse impact is objective, it can be resolved as a matter of law." *Balt. Sun Co.*, 437 F.3d at 416.

"Illustrating the observation that "not every [government] restriction is sufficient to chill the exercise of First Amendment rights," we have recognized a distinction between an adverse impact that is actionable, on the one hand, and a de minimis inconvenience, on the other." *Balt. Sun Co.*, 437 F.3d at 416.  "Rather, a § 1983 retaliation plaintiff must demonstrate that the defendant's actions had some adverse impact on the exercise of the plaintiff's constitutional rights." *Suarez Corp. Indus.*, 202 F.3d at 685, *See Wicomico County*, 999 F.2d at 785 ("In order to state a retaliation claim, Appellees are required to show that WCDC's actions adversely impacted these First Amendment rights.").  "[W]e must measure the adverse impact against an objectively reasonable plaintiff." *Balt. Sun Co.*, 437 F.3d at 419. "To amount to retaliation, the conduct must be "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."" *Mun.*

*Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 824 (3d Cir. 2009) (unpublished) *citing McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006).

"In a proximate vein, the Supreme Court has condoned limiting retaliation liability when the challenged government action, whether conduct or speech, is so pervasive, mundane, and universal in government operations that allowing a plaintiff to proceed on his retaliation claim would "plant the seed of a constitutional case" in "virtually every" interchange." *Balt. Sun Co.*, 437 F.3d at 416, *citing Connick v. Myers*, 461 U.S. 138, 148-49, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *see also id.* at 143 (holding that, in the government employment context, public employers can reprimand or punish employees for their speech when that speech does not touch on matters of public concern); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448-49 (4th Cir. 2004); *cf. Umbehr*, 518 U.S. at 675 (noting that retaliation "may be justified [i.e., unactionable] when legitimate countervailing government interests are sufficiently strong"). "Thus, the *Connick* Court recognized that the retaliation cause of action must be administered to balance governmental and private interests so as not to impose liability in everyday, run-of-the-mill encounters." *Balt. Sun Co.*, 437 F.3d at 416. "[A] public official's malicious intent, taken alone, cannot amount to a retaliatory response." *Id.* at 420.  "The plaintiff in a retaliation case must challenge adverse *conduct or*

speech." *Id. citing Constantine*, 411 F.3d at 500 (repeating that retaliation claims challenge government "conduct").

"Illustrating the second *DiMeglio* (*DiMeglio v. Haines,* 45 F.3d 790 (4th Cir. 1995) observation that not "every restriction [is] actionable, even if retaliatory," we have recognized that some government actions, due to their nature, are not actionable even if  they satisfy all the generally articulated elements of a retaliation claim." *Balt. Sun Co.*, 437 at 416-417.   "When the challenged government action is government speech, there is no retaliation liability -- even if the plaintiff can demonstrate a substantial adverse impact -- unless the government speech concerns "private information about an individual" or unless it was "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow."" *Id.* at 417, *citing Suarez*, 202 F.3d at 689. "Other courts, likewise, have held that there is no retaliation when the government's alleged retaliatory action was government speech." *Balt. Sun Co.*, 437 F.3d at 417 *citing*, *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998); *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997); *accord Kirby*, 388 F.3d at 450 n. 8. "This limitation on the retaliation cause of action based on government speech is necessary to balance the government's speech interests with the plaintiff's speech interests." *Balt. Sun. Co.*, 437 F.3d at 417, *citing Suarez*, 202 F.3d at

688-89.

"Determining whether a plaintiff's *First Amendment* rights were adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp. Indus.,* 202 F.3d at 686,  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)  ("The definition of adverse action is not static across contexts.").

As Judge Hamilton wrote for the *Suarez* court:

> Just as the nature of the retaliatory acts impacts whether a public employee's *First Amendment* rights were  adversely affected, so too the nature of the retaliatory acts impacts whether those acts are actionable when a private citizen is the speaker and a public official is the retaliator. For example, a public official who  restricts the award of or terminates public benefits based on the citizen's exercise of his *First Amendment* rights adversely affects that citizen's *First Amendment* rights. *See, e.g., Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 686, 135 L. Ed. 2d 843, 116 S. Ct. 2342 (1996) (holding that the termination of a garbage contract constituted retaliation for an independent contractor's exercise of freedom of speech); *Sherbert v. Verner*, 374 U.S. 398, 409-10, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963) (holding that retaliation existed where the government denied unemployment benefits to a person whose religion precluded her from accepting a job that required her to work on Saturdays). The same officials, however, are obviously permitted to require the government contractor to submit documentation that no public funds were spent on espousing political views, or to require a person seeking unemployment benefits to fill out an additional form explaining why she cannot work on Saturdays.

> The nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech. Not only is

there an interest in having public officials fulfill their duties, a public official's own *First Amendment* speech rights are implicated. Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's *First Amendment* rights, even if defamatory. *See X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 1999 WL 993442, at *14 (2d Cir. 1999) (to be reported at 196 F.3d 56) (holding that, in the absence of threats, intimidation, or coercion, legislators' "disparaging, accusatory, or untrue statements about X-Men fail to state a claim for violation of X-Men's constitutional rights"); *Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999) (holding that a citizen's *First Amendment* rights were not adversely affected because she had "alleged only that she was the victim of criticism, an investigation (or an attempt to start one), and false accusations: all harms that, while they may chill speech, are not actionable under our *First Amendment* retaliation jurisprudence"); *Penthouse Int'l Ltd. v. Meese*, 291 U.S. App. D.C. 183, 939 F.2d 1011, 1015-16 (D.C. Cir. 1991) (holding that public officials were entitled to qualified immunity for criticism they leveled at publishers of pornography and noting that "the Supreme Court has never found a government abridgment of *First Amendment* rights in the absence of some actual or threatened imposition of governmental power or sanction"); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3d Cir. 1984) (holding that a borough that sent letters to a landowner encouraging, but not threatening, intimidating, or coercing, the landlord to terminate its leases with a billboard owner did not violate the billboard owner's *First Amendment* rights where the landowner terminated the leases in order to curry favor with the borough); *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 38-39 (2d Cir. 1983) (holding that a public official  who sent letters to retail stores requesting that they refrain from selling a controversial board game did not violate the board game manufacturer's *First Amendment* rights, and declaring that to rise to the level of conduct that violates free speech rights, a public official's comments must "reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request"); *Thomas v. Hickel*, 947 P.2d 816, 821 (Alaska 1997) (concluding that the *First Amendment* protects an official's right to speak

truthfully in response to criticism even if the official's speech is retaliatory and stating, "We do not believe that imposing section 1983 liability on a public official who responds in kind to protected speech critical of the official would be consistent with the *First Amendment*."); *cf. Bantam Books, Inc. v. Sullivan* , 372 U.S. 58, 68, 9 L. Ed. 2d 584, 83 S. Ct. 631 (1963) (finding a constitutional violation where a Rhode Island Commission's conduct amounted to "thinly veiled threats to institute criminal proceedings" against publishers who did not make efforts to stop circulating publications on a list created by the Commission); *Gini v. Las Vegas Metro. Police Dept.*, 40 F.3d 1041, 1045 (9th Cir. 1994) (holding that defamation must be accompanied by a harm to "some more tangible interests" to be actionable retaliation (internal quotations omitted)). One possible exception to this rule is where the retaliatory disclosure of information "relates to 'those personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.'"; that is, the resulting injury caused by the disclosure of the information in retaliation for engaging in protected conduct is sufficiently embarrassing, humiliating, or emotionally distressful. *See Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998) (holding that a sheriff's publication of the explicit details of a rape in retaliation for the rape victim's criticism of the sheriff was sufficiently adverse to "chill people of ordinary firmness"). This aspect of the contextual analysis, however, has been limited to cases in which the public official has disclosed damaging information about an individual. *See Mattox v. City of Forest Park*, 183 F.3d 515, 521 n.3 (6th Cir. 1999)  ("Analysis of retaliation cases under the *First Amendment* is distinct, and the effect of public disclosure of damaging information about an individual may be enough to trigger constitutional protection, as in Bloch and Barrett.").

*Suarez Corp. Indus.*, 202 F.3d at 686-688.

"In general, constitutional retaliation claims are analyzed under a three-part test." *Mun. Revenue Servs., Inc. v. McBlain*, 347 Fed. Appx. 817, 823 (3d Cir. Pa. 2009) (unpublished) *citing Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d

Cir. 2004). " Plaintiff must prove (1) that [it] engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Id.*

The dispute here does not center around the first or third elements.  It is clear that as a newscaster, the protected activity that Bartley participated in was speech. Nor does Taylor argue that the third element is lacking in Bartley's claims.[6]  The dispute centers around the second element.  Accordingly, the hurdle for Bartley to jump is whether Taylor's actions were retaliatory, in that the speech of a person of ordinary firmness would be chilled?  The Court concludes, in all nine points of alleged retaliation, that the answer is no.

 1., 7., and 8. Bartley alleges he was retaliated against because Taylor "refus[ed] Plaintiff opportunities to broadcast Lock Haven University sports." and because Taylor "den[ied] Plaintiff a meaningful opportunity to respond to a request for proposal to broadcast Lock Haven University sporting events in violation of state rules and regulations." and because Taylor did "not select[] ESPN 1050 Williamsport to broadcast Lock Haven University sports despite the fact that it offered the best and highest value."

Bartley's first, seventh and eighth bases for a *First Amendment* retaliation claim form a question left unanswered by the United States Supreme Court, and

---

[6]Because Taylor does not argue the third element in her briefs, and because the Court's decision is based on the second element, the Court need not reach the causal element today.   Accordingly, today's holding is based on the issue of "what constitutes retaliation." The issue of "causation" is not decided in this case.

which is the source of the start of a circuit split.  The Supreme Court left open the issue of whether an independent contractor without a preexisting relationship with a governmental entity may bring a *First Amendment* retaliation claim when it is awarded a government contract. The Supreme Court stated, "Finally, we emphasize the limited nature of our decision today.  Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 685, 116 S. Ct. 2342, 2352, 135 L. Ed. 2d 843 (1996)

The United States Court of Appeals for the Third Circuit has read *Umbehr* narrowly and held that a suit by a bidder or applicant for a new government contract without a preexisting relationship cannot state a *First Amendment* retaliation claim.[7]  *McClintock v. Eichelberger*, 169 F.3d 812, 816 (3d Cir. 1999) (holding that a marketing and advertising firm, and its principal shareholder, did not have sufficiently ongoing relationship with regional planning and development

---

[7]Specifically, the Third Circuit has cautioned that the lower courts should not answer the question left open by the Supreme Court and extend the doctrine, and that the decision on whether or not to expand the doctrine should be left to the United States Supreme Court.  *McClintock*, 169 F.3d at 817.

22

commission to support the firm's claim that the development commission violated the First Amendment by refusing the firm's bid on a new contract in alleged retaliation for the firm's support of certain political candidates, where the firm and its shareholder had only two prior contracts with the development commission for discrete services and, as vendor, supplied promotional materials to commission.) (Roth, J. dissenting), *see also Allstate Transp. Co., Inc. v. Southeastern Pa. Transp. Auth., 2000 WL 329015 (E.D. Pa. March 27, 2000)* (applying *McClintock*), *and see Prisma Zona Exploratoria de Puerto Rico, Inc. v. Calderon,* 162 F. Supp. 2d 1 (D.P.R. 2001)*, but see Oscar Renda Contracting, Inc. v. City of Lubbock, Tex.*, 463 F.3d 378 (5th Cir. 2006) (holding that the First Amendment protects an independent contractor whose bid has been rejected by a city in retaliation for the contractor's exercise of freedom of speech, even if the contractor had no pre-existing commercial relationship with that city).

Consequently, this Court follows the clear direction of the Third Circuit in not expanding the field of *First Amendment* retaliation claims made by private citizens to bidders or applicants for a new government contract without a preexisting relationship.  The undersigned holds that these particular claims of Bartley's fail as a matter of law.

2.  Bartley alleges he was retaliated against because Taylor "fil[ed] a frivolous lawsuit against Plaintiff."

Here, Bartley argues that he is currently suing Taylor because Taylor previously sued him.  Two different *First Amendment* rights intersect in this allegation - the right to free speech versus the right to petition.  The right to petition has only recently been developed, and is  not entirely refined.  Based on what has been developed to date, however, this Court finds that this allegation must fail as well.

It is through the (relatively recent) "Noerr-Pennington" doctrine and its progeny that the *First Amendment* right to petition the courts has been explored by the United States Supreme Court.  *See  Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 669-671, 85 S.Ct. 1585, 1592-1594, 14 L.Ed.2d 626 (1965); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S. Ct. 609, 612, 30 L. Ed. 2d 642 (1972) (holding that "[t]he right of access to the courts is indeed but one aspect of the right of petition."); *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731 103 S.Ct. 216 (1973) (applying the right to petition outside the antitrust context); *McDonald v. Smith*, 472 U.S. 479, 484, 105 S. Ct. 2787, 2791, 86 L. Ed. 2d 384 (stating in dictum that filing a complaint in court is a form of petitioning activity; but cautioning that baseless litigation is not immunized by the First Amendment right

24

to petition).

Construing the right to petition narrowly to only encompass the scope of the right as has been heretofore defined outside of the antitrust context, it appears that Taylor's activity is protected in this action by the dictum stating that filing a complaint in court is petitioning activity, so long as what she filed was not baseless litigation.  *See McDonald, supra.*

"*Noerr...*withheld immunity from sham activities..." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56, 113 S. Ct. 1920, 1926, 123 L. Ed. 2d 611 (1993).  "[W]e...hold that an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *Id.* at 57.  As Justice Thomas wrote, at length, for the *Columbia Pictures* court:

> [W]e have consistently assumed that the sham exception contains an indispensable objective component. We have described a sham as evidenced by repetitive lawsuits carrying the hallmark of insubstantial claims.  *Otter Tail Power Co. v. United States*, 410 U.S. 366, 380, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359 (1973) (emphasis added). We regard as sham private action that is not genuinely aimed at procuring favorable government action, as opposed to a valid effort to influence government action. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S., at 500, n. 4, 108 S.Ct., at 1937, n. 4. And we have explicitly observed that a successful effort to influence governmental action ... certainly cannot be characterized as a sham. *Id.,* at 502, 108 S.Ct., at 1938. *See also Vendo Co. v. LektroVend Corp.*, 433 U.S. 623, 645, 97 S.Ct. 2881, 2894, 53 L.Ed.2d 1009 (1977) (BLACKMUN, J., concurring in result) (describing a successful lawsuit as a genuine attemp[t] to use the ... adjudicative process legitimately rather than a pattern of baseless, repetitive claims' ). Whether applying *Noerr* as an antitrust doctrine or

invoking it in other contexts, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham. *See, e.g., FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 424, 110 S.Ct. 768, 775, 107 L.Ed.2d 851 (1990); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 914, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982). *Cf. Vendo, supra*, 433 U.S., at 635, 636, n. 6, 639, n. 9, 97 S.Ct., at 2889, 2890, n. 6, 2891 n. 9 (plurality opinion of REHNQUIST, J.); *id.*, at 644, n., 645, 97 S.Ct., at 2894, n., 2894 (BLACKMUN, J., concurring in result). Indeed, by analogy to Noerr's sham exception, we held that even an improperly motivated lawsuit may not be enjoined under the National Labor Relations Act as an unfair labor practice unless such litigation is baseless. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 744, 103 S.Ct. 2161, 2170, 2171, 76 L.Ed.2d 277 (1983). Our decisions therefore establish that the legality of objectively reasonable petitioning directed toward obtaining governmental action is not at all affected by any anticompetitive purpose [the actor] may have had. *Noerr*, 365 U.S., at 140, 81 S.Ct., at 531, *quoted in Pennington, supra*, 381 U.S., at 669, 85 S.Ct., at 1593.

Our most recent applications of *Noerr* immunity further demonstrate that neither *Noerr* immunity nor its sham exception turns on subjective intent alone. In *Allied Tube, supra*, 486 U.S., at 503, 108 S.Ct., at 1938, and *FTC v. Trial Lawyers, supra*, 493 U.S., at 424, 427, and n. 11, 110 S.Ct., at 775, 777, and n. 11, we refused to let antitrust defendants immunize otherwise unlawful restraints of trade by pleading a subjective intent to seek favorable legislation or to influence governmental action. *Cf. National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 101, n. 23, 104 S.Ct. 2948, 2960, n. 23, 82 L.Ed.2d 70 (1984) (" [G]ood motives will not validate an otherwise anticompetitive practice"). In *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), we similarly held that challenges to allegedly sham petitioning activity must be resolved according to objective criteria. We dispelled the notion that an antitrust plaintiff could prove a sham merely by showing that its competitor's purposes were to delay [the plaintiff's] entry into the market and even to deny it a meaningful access to the appropriate ... administrative and legislative fora. *Id.*, at 381, 111 S.Ct., at 1354 (internal quotation marks

omitted). We reasoned that such inimical intent may render the manner of lobbying improper or even unlawful, but does not necessarily render it a "sham." *Ibid. Accord, id.*, at 398, 111 S.Ct., at 1363 (STEVENS, J., dissenting).

In sum, fidelity to precedent compels us to reject a purely subjective definition of "sham." The sham exception so construed would undermine, if not vitiate, *Noerr*. And despite whatever superficial certainty it might provide, a subjective standard would utterly fail to supply real intelligible guidance. *Allied Tube, supra*, 486 U.S., at 508, n. 10, 108 S.Ct., at 1941, n. 10.

We now outline a two-part definition of "sham" litigation. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," *Noerr, supra*, 365 U.S., at 144 81 S.Ct., at 533 (emphasis added), through the "use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon," *Omni*, 499 U.S., at 380, 111 S.Ct., at 1354 (emphasis in original). This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability. Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58-60, 113 S. Ct. 1920, 1927-28, 123 L. Ed. 2d 611 (1993).

Based on the first part of the sham test developed by the Supreme Court, the undersigned finds that the Clinton County litigation instituted by Taylor was not a sham and is thus immunized by *Noerr* and its progeny. A reasonable person could conclude that the litigation was filed in an attempt to succeed on the merits. Although the litigation was ultimately unavailing, it was not unreasonable for Taylor to believe that Bartley's article was libelous as it insinuated her liability in a lawsuit to which she was not a party. Additionally, it was not unreasonable for Taylor to believe that Bartley was a part of an organization that may have committed unlawful acts. This allegation, again, turned out to be unavailing. It was not unreasonable, however, to believe that Bartley was conspiring against her and to seek discovery to determine if this was, in fact, the case.

Moreover, in addition to the right, in the petition clause, a balancing of interests leads this Court to the same conclusion, even if the undersigned has construed the right to petition too broadly. Bartley certainly has the right to speak on his radio program. However, that right is not absolute. "[T]he Supreme Court never has accepted the view that the *First Amendment* prohibits all government regulation of expression." ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES THIRD EDITION (Aspen Publishers 2006), *and see Konigsberg v. State Bar of California*, 366 U.S. 36; 81 S. Ct. 997; 6 L. Ed. 2d 105

(1960).

When Bartley's speech becomes allegedly defamatory, it would be illogical for this Court to say to a public employee - you may sue the speaker for defamation and slander to try to protect your name and reputation, but then the speaker may sue you simply because you  sued him.  If this Court were to hold that a "non-sham" civil lawsuit against a reporter, who may fairly be characterized as a 'shock-jock,'[8] had a chilling effect on the shock-jock's speech and therefore is retaliatory, then there would be no judicial check on this speaker's speech and the speaker could tumble down the slippy slope of accusatory prattle into actionable defamation.

The interests of the two individuals must be balanced so that the scale reaches a level of reason.  It is unreasonable to consider a "non-sham" lawsuit as retaliatory.

Here, Taylor had reason to believe she needed to access the courts to protect

---

[8]The characterization of Bartley as a 'shock-jock' is warranted by the type of reporting Bartley engages in based on the facts set forth above.  Comparing public figures to Adolf Hitler is an all-too-common and generally witless metaphor in modern society.  Had Bartley been reporting on, and made the Hitler comparison to, say, Pol Pot, then this type of reporting would not earn him a 'shock-jock' characterization.   It is a failed analogy to compare a person who runs an athletic program at a public university to an infamous dictator who engaged in mass murder, with the goal of destroying a race and culture.

her good name and reputation.  Her case, although not ultimately prevailing, certainly does not rise to the level of retaliation under the *First Amendment*. Bartley was not threatened with intimidation or sanctions or the loss of public benefits.  Taylor was merely appealing to the courts to protect herself.  To characterize this as retaliation raises this claim to an absurd level which garners no support with this Court.

### 3.  Bartley alleges he was retaliated against because Taylor "contact[ed] individuals at ESPN  headquarters in Bristol, Connecticut, in an effort to silence Plaintiff and harm his career."

This Court is again faced with battling *First Amendment* rights, but with this allegation, the right is identical on both sides: the right to free speech.

Taylor's complaining to Bartley's superiors is also not actionable as a *First Amendment* retaliation claim. Taylor's own speech rights are implicated.   As Judge Hamilton explained in some detail in *Suarez Corp.*:

> Just as the nature of the retaliatory acts impacts whether a public employee's *First Amendment* rights were  adversely affected, so too the nature of the retaliatory acts impacts whether those acts are actionable when a private citizen is the speaker and a public official is the retaliator.
>
> *****
>
> The nature of the alleged retaliatory acts has particular significance where the public official's acts are in the form of speech. Not only is there an interest in having public officials fulfill their duties, a public official's own *First Amendment* speech rights are implicated. Thus, where a public official's alleged retaliation is in the nature of speech, in

the absence of a threat, coercion, or intimidation intimating that
punishment, sanction, or adverse regulatory action will imminently
follow, such speech does not adversely affect a citizen's *First
Amendment* rights, even if defamatory. *See X-Men Sec., Inc. v. Pataki*,
196 F.3d 56, 1999 WL 993442, at *14 (2d Cir. 1999) (to be reported at
196 F.3d 56) (holding that, in the absence of threats, intimidation, or
coercion, legislators' "disparaging, accusatory, or untrue statements
about X-Men fail to state a claim for violation of X-Men's constitutional
rights"); *Colson v. Grohman*, 174 F.3d 498, 512 (5th Cir. 1999) (holding
that a citizen's *First Amendment* rights were not adversely affected
because she had "alleged only that she was the victim of criticism, an
investigation (or an attempt to start one), and false accusations: all harms
that, while they may chill speech, are not actionable under our *First
Amendment* retaliation jurisprudence"); *Penthouse Int'l Ltd. v. Meese*,
291 U.S. App. D.C. 183, 939 F.2d 1011, 1015-16 (D.C. Cir. 1991)
(holding that public officials were entitled to qualified immunity for
criticism they leveled at publishers of pornography and noting that "the
Supreme Court has never found a government abridgment of *First
Amendment* rights in the absence of some actual or threatened imposition
of governmental power or sanction"); *R.C. Maxwell Co. v. Borough of
New Hope*, 735 F.2d 85, 89 (3d Cir. 1984) (holding that a borough that
sent letters to a landowner encouraging, but not threatening, intimidating,
or coercing, the landlord to terminate its leases with a billboard owner
did not violate the billboard owner's *First Amendment* rights where the
landowner terminated the leases in order to curry favor with the
borough); *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 38-39
(2d Cir. 1983) (holding that a public official  who sent letters to retail
stores requesting that they refrain from selling a controversial board
game did not violate the board game manufacturer's *First Amendment*
rights, and declaring that to rise to the level of conduct that violates free
speech rights, a public official's comments must "reasonably be
interpreted as intimating that some form of punishment or adverse
regulatory action will follow the failure to accede to the official's
request"); *Thomas v. Hickel*, 947 P.2d 816, 821 (Alaska 1997)
(concluding that the *First Amendment* protects an official's right to speak
truthfully in response to criticism even if the official's speech is
retaliatory and stating, "We do not believe that imposing section 1983
liability on a public official who responds in kind to protected speech

critical of the official would be consistent with the *First Amendment*.")...

*Suarez Corp. Indus.*, 202 F.3d at 686-688.

Taylor's complaint to Carol Stiff about Bartley is not actionable as having

chilled Bartley's *First Amendment* rights.  Taylor did not threaten, coerce or

intimidate Bartley.  She merely complained to an acquaintance she believed to be

superior to Bartley in the ESPN chain of command.   Accordingly, Taylor's own

right to free speech protects her from the accusation of retaliation.

4.  Bartley alleges he was retaliated against because Taylor "direct[ed] her staff not
to communicate with Plaintiff."

Bartley's claim that Taylor would not, and directed her staff not to,

communicate with Bartley is also not a cognizable claim.  Judge Niemeyer, writing

for the *Balt. Sun Co.* Court, stated:

> It is common knowledge [] that reporting is highly competitive, and
> reporters cultivate access -- sometimes exclusive access -- to sources,
> including government officials. Public officials routinely select among
> reporters when granting interviews or providing access to nonpublic
> information. They evaluate reporters and choose to communicate with
> those who they believe will deliver their desired messages to the  public.
> By giving one reporter or a small group of reporters information or
> access, the official simultaneously makes other reporters, who do not
> receive discretionary access, worse off. These other reporters are
> sometimes denied access because an official believes them to be
> unobjective. See *Snyder v. Ringgold, 133 F.*3d 917, 1998 WL 13528 *1,
> *4 (4th Cir. 1998) (unpublished opinion) (noting the "common and
> widely accepted practice among politicians of granting an exclusive
> interview to a particular reporter" and "the equally widespread practice

of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments").

*****

[G]overnment officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression.

*Balt. Sun Co., supra,* 437 F. 3d 417-418.

 To use sports lexicon, it is acceptable for public figures to attempt an end run, even when faced with a reporter's full court press to avoid leading with one's chin.  This strategy by public figures is par for the course;  Bartley himself conceded in the undisputed facts that it is not uncommon for individuals to refuse to comment or be interviewed, and that, in fact, he has had people refuse throughout his career.  "Declining to comment" is not a cognizable *First Amendment* claim.


5. Bartley alleges he was retaliated against because Taylor "attempted to circumvent Pennsylvania's Right to Know Act by directing her staff to communicate via handwritten or type-written notes rather than emails."

Bartley strikes out on this allegation as well, insofar as these actions do not have a chilling effect on the speech of a person of ordinary firmness.

The purpose of Pennsylvania's Right to Know Law, 65 P.S. § 67.101, *et. seq.*, is to scrutinize the acts of public officials and to make officials accountable in

33

their use of public funds.  22 Summ. Pa. Jur. 2d Municipal and Local Law § 5:1 (2d ed.), *and see Buehl v. Pennsylvania Dept. of Corrections,* 955 A.2d 488 (Pa. Commw. Ct. 2008).  The Right to Know Law presumes that all state agency records are subject public disclosure unless an exemption applies.  The agencies must provide access to public records.  65 P.S. §67.301(a); 65 P.S. §67.302(a). However, not every document is available for  public consumption. *See, e.g.* section 708 of the Right to Know Law.

The nature of this allegedly retaliatory act is so insignificant that there is no way the undersigned could find that Taylor's advising her staff to communicate with her orally would have a chilling effect on Bartley's speech.  "The determination of whether government conduct or speech has a chilling effect or an adverse impact is an objective one -- we determine whether a similarly situated person of "ordinary firmness" reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Balt. Sun Co.*, 437 F.3d at 416, *citing  Constantine*, 411 F.3d at 500; *Wicomico County*, 999 F.2d at 786; *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (tailoring adverse impact analysis to specific circumstances presented). "Because our analysis of the adverse impact is objective, it can be resolved as a matter of law." *Balt. Sun Co.*, 437 F.3d at 416.

As a matter of law, the Court finds that a person of ordinary firmness would not be chilled by a supervisor telling her staff to communicate with her orally.  It simply does not rise to the level of actionable retaliation.

6.  Bartley alleges he was retaliated against because Taylor "attempt[ed] to charge broadcast fees for NCAA events when she had no authority to do so."

This allegation is the most insubstantial of all of Bartley's myriad allegations.  Bartley claims that Taylor retaliated against him for his speech based on an email chain which attemped to charge broadcast fees for NCAA events.  However, according to the undisputed facts, this email exchange took place in May 2009.  According to the undisputed facts Taylor heard Bartley's broadcast for the first time in June 2009.   The retaliation claim based on this set of facts fails because this particular exchange takes place  before Taylor heard Bartley's speech.  Therefore, Taylor could not possibly be retaliating against Bartley for speech she was then unaware of.

9.  Bartley alleges he was retaliated against because Taylor "prevent[ed] Plaintiff from establishing an internship program at Lock Haven University."

This final allegation also lacks merit.   The failure to establish an internship program is certainly is a prime example of a "'de minimis inconvenience' to [one's]

exercise of First Amendment rights."[9]  *Constantine*, 411 F.3d at 500.   Bartley was

denied no public benefit in an internship program at his radio station.  *See, e.g.,*

*Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 686, 135 L. Ed. 2d 843, 116

S. Ct. 2342 (1996).  Nor was he injured with the disclosure of sufficiently

embarrassing, humiliating, or emotionally distressful information about him. *See*

*Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998).  The failure to establish an

internship program is precisely the type of "mundane" action that would  "plant the

seed of a constitutional case" in "virtually every" interchange." *Balt. Sun Co.*, 437

F.3d at 416, *citing Connick v. Myers*, 461 U.S. 138, 148-49, 103 S. Ct. 1684, 75 L.

Ed. 2d 708 (1983); *see also id.* at 143.

## III.  CONCLUSION:

None of Bartley's propositions are persuasive. Consequently, defendant's

motion for summary judgment will be granted and final judgment will be entered

in favor of defendant and against plaintiff.

An appropriate Order in accordance with this Memorandum will follow.

---

[9]Moreover, this allegation is not logical.  The desirable interns for a radio station would be those studying for a journalism major.  It appears to the undersigned that the individual or individuals to approach for interns would be the Dean of Academics or the head of the journalism program.

BY THE COURT:


 s/ Matthew W. Brann
Matthew W. Brann
United States District Judge